STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

13-1203


DONALD BUXTON, SR.

VERSUS

STATE OF LOUISIANA, DEPT. OF CORRECTIONS


**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - District 3
PARISH OF CALCASIEU, NO. 11-09254
CHARLOTTE L. BUSHNELL, WORKERS' COMPENSATION JUDGE

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Jimmie C. Peters, Billy Howard Ezell, and Shannon J. Gremillion, Judges.


REVERSED AND RENDERED.

Mark Zimmerman
4216 Lake Street
Lake Charles, LA 70605
(337) 474-1644
COUNSEL FOR PLAINTIFF/APPELLEE:
     Donald Buxton, Sr.

**James D. "Buddy" Caldwell**
**Attorney General**
**Sylvia M. Fordice**
**Assistant Attorney General**
**556 Jefferson Street, 4th Floor**
**Lafayette, La 70501**
**(337) 262-1700**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **State of Louisiana, Department of Public Safety and Corrections**

**PETERS, J.**

The State of Louisiana, through the Department of Public Safety and Corrections (the state), appeals a judgment of the workers' compensation judge (WCJ) ordering it to relocate a washer and dryer from the bedroom of Donald Buxton, Sr. as part of home modifications relating to his work-related injury. For the following reasons, we reverse the WCJ's judgment and render judgment in favor of the state.

## DICUSSION OF THE RECORD

Donald Buxton, Sr. was previously employed by the state as a corrections officer at the Paul Phelps Correctional Center in DeQuincy, Louisiana. On May 8, 2004, he fell from a guard tower at the Correctional Center and suffered multiple work-related injuries which left him totally and permanently disabled.[1] A December 29, 2010 judgment rendered by the WCJ ordered the state, as part of its statutory obligation to provide reasonable and necessary medical treatment, to modify Mr. Buxton's home by providing him with a handicap shower and a lifting recliner, replacing the carpeting in the house with hard flooring, and remodeling the master bedroom.

The state complied with this judgment by entering into a contract with Cypress Care, Inc. (Cypress Care), a Suwannee, Georgia contractor, to perform the necessary modifications and renovations with a completion date of May 16, 2011. When Cypress Care completed the modification and renovation work, a previously enclosed garage had become the new master bedroom; the laundry room, which was previously located off the rear of the enclosed garage, became the handicap-

---

[1] The injuries included crushing injuries to his face, eye sockets and sinuses, and fractures to his nose and elbows.

accessible bathroom; and the washer and dryer previously located in the laundry room were moved into the new master bedroom.[2] The new master bedroom is heated and cooled by a single air conditioner unit of the type found in hotel rooms. It is built into the middle of the exterior wall with the unit being approximately two and one-half feet tall and four feet wide; protruding into the bedroom approximately ten inches; and having a base located approximately six to eight inches above the bedroom floor.[3]

While the scope of the original contract between Cypress Care and the state was not made a part of the record, it is clear that changes were effected after the initial agreement. A March 4, 2011 email from Cynthia White, a Cypress Care representative, to Susan Melancon, a claims adjuster representing the state's interest, discusses Cypress Care's revised proposal for the Buxton project and states that the changes proposed for Mr. Buxton's home include "[m]oving the washer and dryer to the new bedroom and venting the dryer to the outside. We will not enclose the washer and dryer as proposed before." Ms. White attached a new revised proposal to the email which eventually encompassed the scope of the work performed by Cypress Care. The new revised proposal included:

1.   Remove the wall and ceiling coverings in the converted garage and utility rooms.
2.   Move and enlarge door to bathroom to 36".
3.   Cut cement for drains for the W/D, sink, toilet and shower.
4.   Cut exterior wall and install 1.5 ton P-Tac A/C unit with heater.
5.   Reroute existing gas line for the new water heater location.
6.   Run water supply lines for the toilet, sink, W/D and shower.
7.   Run electrical for the W/D, A/C, lights, vents, outlets and switches.

---

[2] The record establishes that the new bedroom is 18 feet long and 10.6 feet wide, and the new bathroom is 10.8 feet long by 6.6 feet wide.

[3] The record does not contain a to-scale drawing of the project, and the estimations of the size of the air condition unit are based on examination of the photographs introduced into evidence.

8. Install insulation in the walls and ceilings.
9. Install accessible shower with grab bars and bench.
10. Install water resistant sheetrock on the walls and ceiling of bathroom.
11. Widen and install interior door to main residence, using existing knob.
12. Paint walls, ceiling and trim of bedroom and bathroom.
13. Remove laminate flooring and install vinyl flooring in the bathroom and bedroom.
14. Remove carpet and install vinyl flooring in the living-room and hallway.
15. Install standard toilet, wall mounted sink, grab bars, towel rack and paper holder.
16. Form, pour and finish 4'x4' slab on the rear of the house for relocated water heater.
17. Build water heater closet walls and cover with vinyl siding.
18. Reinstall existing hot-water heater.
19. Install r-panel metal roofing with vent stack.
20. Install double-walled vent for heater.
21. Install exterior grade door with supply vent grill.
22. Install painted baseboard after the flooring is installed.

* Provide necessary permits and inspections as required by the city / parish.
* Clean and haul all construction debris.
* Provide client with color and design choices as to new flooring and paint.

On April 6, 2011, Gina Buxton, Mr. Buxton's wife,[4] signed a form entitled "Scope of Work[,]" which listed these modification proposals.

On May 16, 2011, Mrs. Buxton signed a Completion Statement provided her by Cypress Care. The text of the statement included the following language:

We trust you are pleased with the home modifications that were recently completed at your home. Please take a moment to sign and complete the statement below to indicate that the work has been completed to your satisfaction.

The following language appears immediately above the signature line:

This statement will affirm that the home modification services provided have been completed and were done so to my satisfaction.

---

[4] Mrs. Buxton testified that she is paid through the workers' compensation coverage to function as her husband's caregiver.

3

In signing the Completion Statement, Mrs. Buxton left the comments section, located below the signature, line blank.

Within a few days after Mrs. Buxton executed the Completion Statement, she and her husband complained to Cypress Care of problems with the location of the washer and dryer. Specifically, the Buxtons complained that the noise generated by the appliances was a problem in the limited space of the bedroom and that their operation had the potential of driving up the cost of utilities because the air conditioner ran non-stop to offset the heat generated by the dryer. These complaints resulted in a May 26, 2011 proposal from Ms. White to Ms. Melancon stating in part:

> Mr. and Mrs. Buxton asked us to address the location of the washer and dryer in the bedroom where Donald now sleeps.
>
> **Project**: Laundry Relocation
>
> Homeowner requests that we relocate the washer and dryer from the new location in the accessible converted garage, into the main residence in a secondary bedroom. The concern is that the heat and noise generated from the washer and dryer will be uncomfortable for Mr. Buxton and would cause the new P-Tac/AC unit to run continuously, resulting in large ongoing electrical utility bills. The new location would be in an unused portion of the home and would require permits by the local parish building department.

Ms. White further states in this correspondence that the cost for relocating the washer and dryer to the bedroom would be an additional $10,937.50 in labor and materials. A counter proposal forwarded to Ms. Melancon by Ms. White on July 27, 2012, involved keeping the washer and dryer in the master bedroom, but enclosing it inside a utility closet. This solution, according to the correspondence, would only cost $6,100.00 in labor and materials.

4

The failure of the state and Cypress Care to reach an agreement on how to address the Buxtons' complaints resulted in Mr. Buxton's counsel writing the state on October 17, 2011, requesting the following relief:

> The contractor placed Mr. Buxton's washer and dryer in their bedroom temporarily until they could get approval to put the washer and dryer in the extra bedroom or bathroom. This makes it difficult for Mr. Buxton to rest. And when his wife uses bleach in the wash it makes him sick. Also, their utility bill has increased since the air conditioner is working harder when the dryer is running. Please approve and allow the contractor to move the washer and dryer into the extra bedroom or bathroom, or wherever they need to.

The state denied this request by a letter dated October 21, 2011, and ten days later Mr. Buxton filed a disputed claim for compensation, seeking to have the washer and dryer removed from his bedroom.[5] He further sought penalties and attorney fees based on the state's failure to perform this modification.

Following a hearing on the merits, the WCJ rendered oral reasons ordering the state to relocate the washer and dryer from the master bedroom to a bathroom located in another part of the house. The WCJ further assessed the state with $2,000.00 in penalties and $3,000.00 in attorney fees. The WCJ executed a written judgment conforming with its judgment on June 11, 2013, and, thereafter, the state perfected this appeal raising three assignments of error:

I.     The workers' compensation judge erred as a matter of law in ordering the washer and dryer removed from the master bedroom and relocated to the old bathroom in the absence of medical necessity pursuant to La. R.S. 23:1203(A).

II.    The workers' compensation judge erred in ordering the removal and relocation of the washer and dryer where [the state's] denial of the request was not appealed pursuant to La. R.S. 23:1203.1(J).

---

[5] The disputed claim also contained an issue pertaining to dental care. However, that dispute was not considered during the hearing and is not part of the judgment rendered.

III.  The workers' compensation court abused its discretion as it is prohibited by Article 7, Section 14(a) of the Louisiana constitution from ordering a renovation of the Buxton's rental home.

IV.  The workers' compensation judge erred in awarding penalties and attorney's fees to the claimant in the absence of proof that the removal and relocation of the washer and dryer were reasonable and necessary and where the claimant failed to appeal the denial.

## OPINION

The scope of appellate review of factual findings by a WCJ is well settled.

> [F]actual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. *Smith v. Louisiana Dept. of Corrections*, 93-1305 (La.2/28/94), 633 So.2d 129, 132; *Freeman v. Poulan/Weed Eater*, 93-1530 (La.1/14/94), 630 So.2d 733, 737-38.  In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Freeman, supra* at 737-38; *Stobart v. State through Dept. of Transp. and Development*, 617 So.2d 880, 882 (La.1993); *Mart v. Hill*, 505 So.2d 1120, 1127 (La.1987).

*Poissenot v. St. Bernard Parish Sheriff's Office*, 09-2793, p. 6 (La. 1/9/11), 56 So.3d 170, 174-75.

Furthermore, an issue raising a legal error is reviewed by determining whether the WCJ's ruling is legally right or wrong. *LeBlanc v. Lafayette Consol. Gov't*, 07-1608 (La.App. 3 Cir. 5/28/08), 983 So.2d 1022.

In its first assignment of error, the state basically argues that Mr. Buxton failed to establish that the removal of the washer and dryer from the bedroom constituted a medical necessity pursuant to La.R.S. 23:1203(A).  In accordance with La.R.S. 23:1203(A), an employer has a statutory duty to "furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedical treatment" required by the employee as a result of a work-related injury.  Thus, in order to receive the requested services, the employee

6

must prove, by a preponderance of the evidence, the medical necessity of the service in relation to the work-related injury. *McGuyer v. Fidelity & Cas. Co. of N.Y.*, 39,450 (La.App. 2 Cir. 3/2/05), 895 So.2d 701. A finding that the employee is entitled to the medical services is a finding of fact subject to the manifest error standard of review. *Id.*

Mr. Buxton's request is based on three reasons: the noise and heat; his rashes and upper-respiratory-tract infections; and the crowding of the room, which contributed to him falling and breaking five ribs.

The evidence establishes that because of his on-the-job injuries, Mr. Buxton can do little with his upper extremities, is very unstable on his feet, and is totally dependent on his wife's care. His right extremity is more seriously injured than his left, and this requires him to sleep on the left side of the bed where he can use his left elbow to get out of bed. Additionally, because of his lack of mobility, he stays primarily in the bedroom, even taking his meals there.

A not-to-scale drawing utilized by Cypress Care for the renovation process and photographs taken after the Buxtons began to occupy the bedroom were used by both Mr. Buxton and the state to establish the physical layout of the room and its contents. These exhibits establish that Mr. Buxton's bed is located on the interior wall directly opposite the air conditioner. The headboard of the bed doubles as a bookshelf, adding at least one foot to its overall length, and results in a maximum space between the foot of the bed and the exterior wall of three feet. That space is even smaller at the point where the air conditioner protrudes out of the exterior wall.

The washer and dryer are located to the right of the air conditioner in the corner created by the exterior-bedroom wall and the interior bathroom wall. There

7

appears to be a space of approximately three feet from the right corner of the bed to the corner of the washing machine, but the passage space is reduced by the presence of a small movable shelf located against the side of the washer. The photographs reveal that items are also located against the exterior bedroom wall to the left of the bed, including a plant, a bookcase/shelf, and a chest of drawers. However, Mrs. Buxton testified that after the photographs were taken, the bookcase/shelf and the plant were removed and replaced with a long dresser. This is the side of the bed where Mr. Buxton sleeps.

Because the left side of the bed is on the opposite end of the room from the bathroom, Mr. Buxton must exit the bed, make his way to the end of the bed, traverse the space between the end of the bed and the air conditioner, and maneuver between the edge of the bed and the small shelf on the side of the washer. In July of 2012, or over eight months after filing his disputed claim, Mr. Buxton caught his foot on something at the foot of the bed between the bed and the air conditioner and fell, fracturing five ribs.

It is clear that everything in the overcrowded bedroom keeps maneuverable space to a minimum. It is equally clear that the presence of the washer and dryer contributes to the overcrowded situation. While the space might be ample for most people, Mr. Buxton's lack of stability makes maneuvering from the bed to the bathroom or any other area of the house a difficult task. However, removing the washer and dryer from the room would not resolve the minimal-space problem. In fact, Mrs. Buxton testified that when the washer and dryer are removed, she intends to move the long dresser to the area previously occupied by the those appliances. Additionally, there is no evidence that the presence of the washer and dryer contributed in any way to Mr. Buxton's July 2012 accident given the location

where the accident occurred.  In fact, Mrs. Buxton acknowledged that other than their contribution to the overall crowded nature of the room, the washer and dryer played no part in Mr. Buxton's fall and resultant injuries.

Thus, the issue is not space or a lack thereof, but whether the removal of the washer and dryer from the bedroom constitutes a medical necessity pursuant to La.R.S. 23:1203(A).  The only medical evidence addressing that issue was provided by Dr. Jagjit S. Chadha, a DeQuincy, Louisiana physician and Mr. Buxton's primary physician.  Mr. Buxton offered a May 1, 2012 statement from Dr. Chadha, which reads as follows:[6]

> To Whom it Concerns-
>
> The pt-Donald Buxton is experiencing UR problems and rashes 2° to having washer and dryer in bedroom.
>
> The washer and dryer needs to be removed to resolve his problems.

In response, the state introduced Dr. Chadha's medical records.  After deciphering Dr. Chadha's handwritten notes as best we can, we note the following information:

> On January 28, 2011, or before the completion of the home modifications, Mr. Buxton complained to Dr. Chadha of a rash in his genital area.  Dr. Chadha's note indicates this was a problem he had previously experienced.
>
> On April 26, 2011, he complained to the doctor of dry skin, for which Dr. Chadha recommended an over-the-counter itch cream.
>
> On February 11, 2011, Mr. Buxton tested positive for the flu, with a fever of 99.6° F.
>
> On September, 14, 2011, Mr. Buxton again complained of a rash in his genital area.  Dr. Chadha's note states that this is a reoccurring problem, and the doctor prescribed Nystatin cream.

---

[6] The letter is handwritten on a plain piece of paper, with a stamped address of Dr. Chadha's clinic, and signed "Chadra[,]" with "Dr. J. S. Chadha" written under the signature.

9

On November 7 and 22, 2011, Mr. Buxton complained about a rash on his neck. On the second visit, Dr. Chadha's notes indicate a diagnosis of contact dermatitis, for which he prescribed a cortisone cream. A close review of Dr. Chadha's November 7, 2011 notes reveals that he also recommended a nose spray. However, no further information is decipherable from the handwritten note.

On November 25, 2011, Dr. Chadha responded to a letter from the state's medication-services administrator, Progressive Medical, Inc., concerning the medical necessity of Fluticasone SPR 50 mcg, which Dr. Chadha had prescribed to Mr. Buxton prior to November 18, 2011. In the statement, Dr. Chadha indicated that he prescribed the medication based on a diagnosis of allergic rash and that the expected length of use of the medication by Mr. Buxton would be off and on for five years.

On December 15, 2011, Dr. Chadha again prescribed the cortisone cream for the contact dermatitis.

On February 22, 2012, Mr. Buxton complained of a frontal headache, a right earache, sore throat, cough, and a fever of 99° F. He was diagnosed by the physician assistant with serous om (otitis media or fluid in the middle ear) and a possible viral syndrome.

On May 1, 2012, Dr. Chadha's notes indicate that Mr. Buxton complained of dry skin and that he asked for a letter concerning his rashes to give to his attorney.

On July 23, 2012, Dr. Chadha noted that Mr. Buxton fell at home on his left side. An August 22, 2012 note states that he suffered fractures of five ribs on his left side.

With regard to the claim that the washer and dryer causes Mr. Buxton's rashes and increased upper-respiratory-tract infections, we find that Dr. Chadha's medical notes lend little support to his claim, and no other evidence supports this claim. Prior to the completion of the home modifications, Mr. Buxton complained of a reoccurring rash in his genital area as well as dry skin. His complaint concerning the genital-area rash continued after the construction, and his first complaint to Dr. Chadha concerning a neck-area rash was on November 7, 2011, or some six months after the completion of the construction and a week after he filed the claim now before us. Dr. Chadha diagnosed this rash on the neck as

contact dermatitis and prescribed fluticasone, a corticosteroid spray, as treatment. Nothing in Dr. Chadha's medical records establishes a causal connection between the rash and the presence of the washer and dryer in the bedroom.

The same can be said of Mr. Buxton's complaints that the chemicals used in the washing and drying process caused him respiratory problems. Dr. Chadha's medical records reveal only two instances of upper respiratory complaints. One occurred before construction was complete, and the other occurred over nine months after completion of the project. In the first instance, Dr. Chadha diagnosed Mr. Buxton's condition as that of the flu, and, in the second, Dr. Chadha's physician assistant concluded that Mr. Buxton was suffering from fluid in the middle ear and a possible viral syndrome.

We conclude that the WCJ erred in finding that Mr. Buxton established by a preponderance of the evidence that the removal of the washer and dryer from the bedroom constituted a medical necessity pursuant to La.R.S. 23:1203(A).

Finally, we find that the WCJ was clearly wrong in concluding that no evidence contradicted Mrs. Buxton's testimony that the placement of the washer and dryer in the bedroom was intended to be temporary and that its relocation constituted a part of the original renovation agreement. This factual finding ignores the specific language of the March 4, 2011 revised proposal submitted to the state by Cypress Care, which became the final working agreement. In that proposal, Cypress Care agreed to "[c]ut cement" to install the drain from the washer; run water supply lines for the washer; and install the necessary electrical lines for both the washer and dryer. Such actions clearly do not indicate a temporary location for the washer and dryer. Additionally, despite her claims that she complained about the location of the washer and dryer before construction was

11

complete and was told that the location was temporary, she signed the Completion Statement with the clear language set forth therein and made no notation of her understanding despite space being made available on the document for just such concerns.

Finally, as to the claim of increased heat and utility bills caused by the washer and dryer, Mr. Buxton presented no evidence other than his and Mrs. Buxton's self-serving testimony concerning this issue. Nor do we find that this problem, if proven, bears on the medical necessity of treating Mr. Buxton's work-related injury.

Based on the foregoing, we find that the WCJ erred in ordering the state to move the washer and dryer out of Mr. Buxton's bedroom. Accordingly, we reverse the judgment of the WCJ and render judgment in favor of the state. Having reached this conclusion, we need not consider the remainder of the state's assignments of error.

## DISPOSITION

For the foregoing reasons, we reverse the judgment of the workers' compensation judge in favor of Donald Buxton, Sr. and against the State of Louisiana, through the Department of Public Safety and Corrections; and render judgment in favor of the State of Louisiana, through the Department of Public Safety and Corrections dismissing the claims of Donald Buxton, Sr. We assess all costs of this appeal to Donald Buxton, Sr.

**REVERSED AND RENDERED.**